BRENNAN ASSOCIATES *v.* OBGYN SPECIALTY GROUP, P.C., ET AL.
(AC 31559)

DiPentima, C. J., and Bishop and Dupont, Js.

Argued November 29, 2010—officially released April 12, 2011

*Christopher Rooney*, with whom, on the brief, were *Anne D. Peterson* and *Kurtis Z. Piantek*, for the appellant-appellee (plaintiff).

*Janine M. Becker*, for the appellees-appellants (defendants).

*Opinion*

DUPONT, J. The plaintiff, Brennan Associates, the lessor of certain commercial premises, appeals from the judgment of the trial court rendered in favor of the defendants, OBGYN Specialty Group, P.C. (OBGYN), the original lessee of the plaintiff's property, and Physicians for Women's Health, LLC (Physicians), the assignee of OBGYN's lease, in the plaintiff's action arising out of the defendants' failure to pay rent and other charges allegedly due under the lease.[1] The primary issue to be decided in the plaintiff's appeal is whether the trial court properly concluded that the plaintiff's failure to accept as a tenant a tanning salon proposed by the defendants constituted a failure to mitigate its

---

[1] The plaintiff filed a three count complaint on August 30, 2006. In the first count, the plaintiff alleged that the defendants breached their lease by their nonpayment of rent and sought as damages the amount of rent due for the period of February, 2006, through August, 2006. In the second count, the plaintiff alleged that the defendants were liable for the remaining sums that would have been due under the lease through the end of the lease term, September, 2006, through September, 2007. In the third count, the plaintiff sought to recover its expenses for its unsuccessful attempts to relet the premises.

damages, thereby exonerating the defendants from liability for the remaining sums due under the lease. We hold that the plaintiff's failure to accept the tanning salon did not constitute a failure to mitigate its damages and, thus, did not absolve the defendants of their obligations under the lease. We, therefore, reverse the judgment of the trial court rendered on the plaintiff's complaint.

The defendants filed a cross appeal from the judgment rendered in favor of the plaintiff on the defendants' counterclaim, in which they alleged that the plaintiff breached its covenant of good faith and fair dealing by unreasonably withholding its consent to the assignment of the lease to the proposed tenant. We affirm the court's judgment that the defendants failed to prove that the plaintiff breached the covenant of good faith and fair dealing.

The following facts and procedural history are relevant to both the plaintiff's appeal and the defendants' cross appeal. The plaintiff commenced this action alleging that it sustained damages arising out of the defendants' failure to pay rent and other charges due pursuant to a commercial lease. See footnote 1 of this opinion. The defendants filed a special defense, claiming that their performance under the lease was discharged by the plaintiff's material breach of the lease because the plaintiff unreasonably withheld its consent to proposed assignments of the lease by the defendants. The defendants also filed a counterclaim seeking monetary damages and attorney's fees and costs, alleging that, by unreasonably withholding its consent to the assignment of the lease, the plaintiff breached its implied covenant of good faith and fair dealing.[2]

---

[2] The plaintiff denied the special defense and denied the material allegations in the counterclaim on the ground that the right to sublet as outlined in paragraph 7 of the lease was limited by the use restriction contained in that same paragraph.

Many of the material facts described herein are not disputed by the parties or were found by the trial court.[3] The plaintiff owns Trumbull Center shopping center, located at 970 White Plains Road in Trumbull. The premises at issue are designated as unit 16 in the shopping center. On June 30, 1997, the plaintiff and OBGYN entered into a written lease for a term of five years with a right to renew the lease for an additional five years. Thereafter, the members of the OBGYN corporation became affiliated with Physicians, which is a group of consolidated obstetrical and gynecological practices. The plaintiff consented to the assignment of the lease to the defendant, Physicians, on August 1, 1997.[4] The original lease term commenced on October 1, 1997, and terminated at the end of September, 2002. On August 5, 2002, the defendants invoked the option to extend the lease for an additional five year term, and the lease was extended through the end of September, 2007.

In July, 2004, the defendants vacated the premises to move to another, larger premises. The defendants continued to pay rent to the plaintiff until February, 2006. Thereafter, no rental payments were made. On April 10, 2006, the plaintiff served the defendants with a notice to quit and the defendants surrendered possession of the premises to the plaintiff on April 17, 2006. After the defendants vacated the premises in July, 2004, agents acting on behalf of the defendants made efforts to find a replacement tenant for the remainder of the

---

[3] The matter was tried to the court over the course of three days in February and March, 2009, and the court issued a memorandum of decision on September 14, 2009.

[4] The plaintiff's consent to the assignment states in relevant part that "[OBGYN] desires to convey to [Physicians] and [Physicians] desires to acquire from [OBGYN] all of [OBGYN's] right, title and interest in and to the [lease] Agreement. . . . [The plaintiff] hereby consents pursuant to the Agreement to such assignment of the Agreement by [OBGYN] to [Physicians]." Pursuant to the terms of the lease, OBGYN remained liable for its obligations under the lease after the assignment to Physicians.

lease term. Paragraph 7 of the lease provides in relevant part that the lessee "will not assign this [l]ease, either in part or whole, nor sublet part of the whole of the premises without the written consent of the [l]essor," and that such "consent shall not be unreasonably withheld . . . ." The plaintiff claims that the defendants were required to provide a medical use tenant, also pursuant to paragraph 7 of the lease, which provides in relevant part that the lessee shall not "use the [premises] for any purpose other than the operation of a practice of medicine, obstetrics and gynecology . . . ."[5]

In December, 2005, a proposal concerning the use of the premises as a tanning salon was sent to the plaintiff.[6]

---

[5] The plaintiff also relies on portions of paragraphs 8 and 24 of the lease to support its position that the use restriction necessarily devolves to potential sublessees and assignees. Paragraph 8 states in relevant part that "if the [l]essee shall assign or underlet the whole or any part of [the] [p]remises, except as herein set forth, or use the premises for any other purpose than that specifically authorized . . . then this [l]ease shall . . . expire and terminate, and the [l]essor may, at any time thereafter" reenter the premises and recover possession. Paragraph 24 contains the general statement that the "covenants and agreements contained in the foregoing [l]ease are binding upon the parties hereto and their respective heirs, executors, successors, legal representatives and assigns."

The court held that the defendants' use of the premises was restricted to the practice of medicine but that the restriction did not apply to any potential sublessee or assignee that the defendants may propose. Therefore, "any tenant, regardless of the type of business, would have been able to sublet the premises under the language of the lease." The court also stated that "the evidence supports that any restriction by [the plaintiff] was imposed after the defendants vacated the premises only as a loyalty factor to the other tenants of the shopping center."

On appeal, the plaintiff claims that this holding was in error. The defendants claim that the fact that the plaintiff made a counteroffer to a tanning salon, which was not a medical use tenant, is evidence that, if the use restriction did apply to potential tenants, the plaintiff waived the restriction.

[6] The record indicates that the defendants brought to the plaintiff a prior written proposal for a lease regarding a potential subtenant, a nail salon, in November, 2004. The court credited the testimony of the defendants' real estate agent, who was told by one of the plaintiff's partners that no tenant for a sublease would be considered if the tenant was a restaurant, nail salon, liquor store or barbershop.

The prospective tenant, the tanning salon, proposed to occupy the premises for the balance of the lease under the terms of the defendants' lease. The tanning salon also requested a three year extension at a negotiated higher monthly rent than provided in the defendants' lease, with an option to renew the lease for an additional five years. The parties agree that the tanning salon required extra time to recoup the costs of fitting the premises to its purposes. The plaintiff never agreed to the tanning salon's proposal, but it made a counteroffer to the tanning salon for a five year lease at an increased rental rate. This deal was never consummated, however.

Regarding the plaintiff's duty to mitigate its damages, the court found that the plaintiff made "acceptable and reasonable" efforts per industry standards to advertise the premises after April, 2006, when it regained possession of the premises but that its refusal to accept the tanning salon's proposal on or around December, 2005, "stopped the liability of the defendants" as of February, 2006. Specifically, the court stated: "The fact that the [tanning salon] proposal also included a request for [an] additional three years seemed reasonable given the unique circumstances of the premises, especially since the tenant was also willing to pay the higher rate requested by the plaintiff for the additional time. . . . [D]ue to the infighting of the [plaintiff] partnership, it took months before a response was given and even then, it came in the form of a counteroffer. If [the plaintiff] had accepted the proposal in reasonable time and fashion, they would have been in the same position as if the contract had been performed by [the defendants]." Accordingly, the court concluded, the defendants owed no money to the plaintiff after February, 2006. From this decision, the plaintiff appealed.

The court also concluded that the plaintiff had no sinister motive or design to mislead or deceive the

defendants and, accordingly, held that the defendants failed to prove their counterclaim alleging a breach of the implied covenant of good faith and fair dealing. From this decision, the defendants filed a cross appeal.

I

The first questions we must resolve are (1) whether the plaintiff had an obligation to mitigate its damages and, if so, (2) when did that obligation arise. The plaintiff argues that its duty to mitigate its damages did not arise until it sought to terminate the defendants' tenancy in April, 2006, and that, because the court found its mitigation efforts after that date were reasonable, it is entitled to recover damages for the defendants' contractual breach. The trial court refused to accept the plaintiff's mitigation argument in light of its conclusion that the plaintiff's failure to accept the tanning salon as a tenant in December, 2005, "stopped the liability of the defendants." We agree with the plaintiff.

"An appellate court's review of a trial court decision is circumscribed by the appropriate standard of review. As we have often stated: The scope of our appellate review depends upon the proper characterization of the rulings made by the trial court. To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous. When, however, the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record. . . . It is well established that [i]n a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony. . . . On appeal, we do not retry the facts or pass on the credibility of witnesses." (Citations omitted; internal quotation marks omitted.) *Powers* v. *Olson*, 252 Conn. 98, 104–105, 742 A.2d 799 (2000).

Connecticut law is clear that "[i]n an action for rent due, a lessor of commercial property is generally under no obligation to mitigate his damages after the lessee fails to pay rent. *White* v. *Miller*, 111 Conn. 53, 58, 149 A. 237 (1930). Such an obligation arises only if the lessor manifests an intent to terminate the tenancy either by taking an unequivocal act showing this intent or by bringing an action for damages based on the tenant's breach of contract. *Sagamore Corp.* v. *Willcutt*, 120 Conn. 315, 318, 180 A. 464 (1935)." *Dewart Building Partnership* v. *Union Trust Co.*, 4 Conn. App. 683, 687, 496 A.2d 241 (1985). In other words, "[w]hen the lessee breaches a lease for commercial property, the lessor has two options: (1) to terminate the tenancy; or (2) to refuse to accept the surrender. . . . Where the land-lord elects to continue the tenancy, he may sue to recover the rent due under the terms of the lease. Under this course of action, the landlord is under no duty to mitigate damages. . . . When the landlord elects to terminate the tenancy, however, the action is one for breach of contract . . . and, when the tenancy is termi-nated, the landlord is obliged to mitigate his damages." (Citations omitted; internal quotation marks omitted.) *K & R Realty Associates* v. *Gagnon*, 33 Conn. App. 815, 819, 639 A.2d 524 (1994).

"The duty to mitigate damages [does] not require the plaintiff [landlord] to sacrifice any substantial right of its own . . . or to exalt the interests of the tenant above its own. . . . It [is] required to make reasonable efforts to minimize damages. What constitutes a reasonable effort under the circumstances of a particular case is a question of fact for the trier. . . . [T]he general rule for the measure of damages in contract is that the award should place the injured party in the same position as he would have been in had the contract been performed . . . ." (Citations omitted.) *Danpar Associates* v. *Som-ersville Mills Sales Room, Inc.*, 182 Conn. 444, 446, 438 A.2d 708 (1980).

In the present case, it is undisputed that the defendants paid rent until February, 2006, and thereafter ceased paying rent. The plaintiff served a notice to quit the premises in April, 2006. Service of the notice to quit manifested the plaintiff's intent to terminate the defendants' tenancy. See *St. Paul's Flax Hill Co-Operative* v. *Johnson*, 124 Conn. App. 728, 735, 6 A.3d 1168 (2010), cert. denied, 300 Conn. 906, 12 A.3d 1002 (2011). In April, 2006, the defendants surrendered possession of the premises to the plaintiff. As a consequence, the defendants were no longer obligated to make monthly rental payments. Instead, because the plaintiff instituted an action for breach of contract, the remaining rental payments due under the lease could be used as part of the calculation of the damages that the plaintiff sustained. See *Rokalor, Inc.* v. *Connecticut Eating Enterprises, Inc.*, 18 Conn. App. 384, 389–90, 558 A.2d 265 (1989).

The plaintiff, having elected to terminate the tenancy, was obligated to mitigate its damages after April, 2006. The court found that after April, 2006, the plaintiff made "acceptable and reasonable" efforts per industry standards to mitigate its damages by advertising the premises. Nonetheless, the trial court further concluded that the plaintiff's failure to accept the tanning salon as a tenant in December, 2005, "stopped the liability of the defendants" for rent as of February, 2006. The court also concluded that, had the plaintiff accepted the tanning salon proposal "in reasonable time and fashion, [it] would have been in the same position as if the contract had been performed by [the defendants]." The question thus becomes whether, despite having fulfilled its obligation to mitigate its damages through its advertising efforts, the plaintiff breached its obligation on another ground, namely, by its rejection of the tanning salon as a tenant. The plaintiff argues that the tanning salon proposal was for neither an assignment nor a

sublease and that its failure to accept the tanning salon proposal did not constitute a breach of its obligation to mitigate its damages. We agree with the plaintiff.

Our Supreme Court has recognized that "despite a landlord's theoretical right to refuse consent to an assignment, its duty to mitigate damages operated as a practical constraint on its exercise of such a right. *Danpar Associates* v. *Somersville Mills Sales Room, Inc.*, supra, [182 Conn.] 446–47." *Warner* v. *Konover,* 210 Conn. 150, 154, 553 A.2d 1138 (1989). In *Danpar Associates* v. *Somersville Mills Sales Room, Inc.*, supra, 447, the trial court concluded that it was unreasonable for the landlord to reject a potential assignment that would have placed it in "statu[s] quo ante." Specifically, the landlord was unwilling to extend the renewal option *contained in the original tenant's lease* to the prospective assignee, and the prospective assignee refused to rent the premises without the renewal option. Id., 445. Our Supreme Court agreed with the trial court, reasoning that "in assessing the reasonableness of the landlord's efforts to mitigate damages the trier may consider whether the landlord was justified in refusing to rent the demised premises to a prospective tenant who was otherwise satisfactory and who would have put him in at least as good a position as if the original contract had been fully performed." Id., 446. The holding in *Danpar Associates* has "the practical effect of limiting the landlord's right to refuse an *assignment* . . . ." (Emphasis added.) Id., 447. The distinction between the present case and *Danpar Associates* lies in the fact that the tanning salon proposal at issue was *not* one for an assignment or sublease; rather, it was for a modification of the lease terms and an extension of its duration.

A lessee cannot convey to a potential subtenant or assignee more than it possesses. See *Powers* v. *Olson,* supra, 252 Conn. 110 ("[i]t is fundamental that a grantor

cannot effectively convey a greater title than he possesses" [internal quotation marks omitted]); *South Norwalk Lodge* v. *Palco Hats, Inc.*, 140 Conn. 370, 374–75, 100 A.2d 735 (1953) ("a tenant cannot be presumed to have granted a larger estate than he himself has"). "The basic distinction between an assignment and a sublease is that by the former, the lessee conveys his whole interest in the unexpired term, leaving no reversion in himself; the latter transfers only a part of the leased premises for a period less than the original term." *Rocklen, Inc.* v. *Radulesco*, 10 Conn. App. 271, 274, 522 A.2d 846 (1987); see also 49 Am. Jur. 2d, Landlord and Tenant § 918 (2006); 52 C.J.S., Landlord and Tenant § 42 (2003). In either case, what the original lessee conveys is *all or part* of the lessee's interest *in an existing lease*. See *Rocklen, Inc.* v. *Radulesco*, supra, 274. Accordingly, an arrangement that substantially modifies the terms of the existing lease cannot be characterized as either an assignment or a sublease.

In the present case, the tanning salon proposed to occupy the premises for the balance of the defendants' lease term for the rental amount contained therein but requested a three year extension at a higher negotiated rental amount and an option to renew the lease for an additional five years. The proposed lease would have materially modified the original lease because it would have extended the term for the proposed tenant for, potentially, another eight years. Because it proposed terms that lengthened the term of the landlord's commitment to the proposed tenant, the tanning salon proposal cannot be characterized as either an assignment or a sublease. Rather, it was a proposal for a new lease, to which the plaintiff responded with a counteroffer that ultimately was rejected. Because the tanning salon proposal was not one for an assignment or sublease, the plaintiff was entitled to negotiate with the tanning salon, or any other prospective tenant, as part of its

efforts to mitigate its damages. See *Danpar Associates* v. *Somersville Mills Sales Room, Inc.*, supra, 182 Conn. 447 (noting that landlord need not accept prospective tenant proffered by current tenant but rather could "relet the premises to a tenant of its own choice at a rent greater than that which the proffered tenant was willing to pay"). Thus, any counteroffer proposed by the plaintiff to the tanning salon was not a waiver of the use restriction because it would require a totally new lease rather than a sublease or an assignment. See footnote 5 of this opinion. Moreover, the court found that, although the plaintiff's delay in responding to the tanning salon proposal was a result of its own internal conflicts, the plaintiff did not act in bad faith in that it had no sinister motive or design to deceive or mislead the defendants by failing to accept the tanning salon proposal.

We conclude that the trial court improperly held that the defendants' liability under the lease was discharged as of February, 2006, because the plaintiff did not accept the tanning salon proposal in December, 2005. The court reasoned that the plaintiff could have accepted the proposal in December, 2005, and been made whole by a tenant willing to sublet the premises at an increased rental for the balance of the defendants' lease, which would have stopped the liability of the defendants. The flaw in the reasoning of the court is that the proposal was not one for an assignment or sublease but one for a new lease. It was not unreasonable for the plaintiff to assess the economic desirability of a longer term lease and conclude that, although the plaintiff might be mitigating the defendants' liability for rent if it agreed to that lease, the plaintiff might be forgoing an economic opportunity of its own due to a partial sale of the shopping center or future profitability of other leases in the shopping center.[7] We reverse the judgment of the trial

---

[7] We need not decide if the plaintiff's rejection of the proposed lessee rested on a violation of the use restriction in the original lease because we

court on the complaint, remand the case with direction to render judgment in favor of the plaintiff and order further proceedings to determine the amount of the plaintiff's damages.

## II

In their cross appeal, the defendants claim that the trial court improperly concluded that they failed to prove that the plaintiff breached its implied covenant of good faith and fair dealing. The defendants alleged in their counterclaim that, pursuant to the lease, the lessee had the right to sublet the premises, upon the consent of the lessor, which consent shall not be unreasonably withheld, and alleged further that the lessor failed to give reasonable consideration to proposed subleases.

"The relevant legal principles are well established. [I]t is axiomatic that the . . . duty of good faith and fair dealing is a covenant implied into a contract or a contractual relationship. . . . To constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a [party] allegedly impedes the [other party's] right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith. . . .

"Bad faith has been defined in our jurisprudence in various ways. Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. . . . Bad faith means more than mere negligence; it involves a dishonest purpose. . . . [B]ad faith may be overt or may consist of inaction,

conclude that it was not unreasonable for the plaintiff to withhold its consent to an arrangement that was a new lease.

and it may include evasion of the spirit of the bargain . . . ." (Citation omitted; internal quotation marks omitted.) *Keller* v. *Beckenstein*, 117 Conn. App. 550, 563–64, 979 A.2d 1055, cert. denied, 294 Conn. 913, 983 A.2d 274 (2009).

Because the plaintiff was not presented with a proposal for an assignment or sublease, the requirement under the lease that the landlord could not unreasonably withhold its consent to a proposed sublease or assignment was not implicated. Moreover, our review of the record reveals that there was ample evidence to support the trial court's conclusion that the plaintiff had no sinister motive or design to mislead or deceive the defendants in refusing to accept the proposed tenant, and, thus, the defendants failed to prove that the plaintiff acted in bad faith. Accordingly, we affirm the judgment of the trial court with regard to the defendants' counterclaim.

The judgment in favor of the defendants on the plaintiff's complaint is reversed and the case is remanded with direction to render judgment for the plaintiff on the complaint and for further proceedings to determine the amount of damages due to the plaintiff by the defendants. The judgment on the defendants' counterclaim is affirmed.

In this opinion the other judges concurred.