# RONALD LORICCO, TRUSTEE *v.* HULA'S NEW HAVEN, LLC, ET AL.*

Superior Court, Judicial District of New Haven, Housing Session
File No. CV-NH-1001-14071

Memorandum filed November 22, 2013

---

* Affirmed. *LoRicco* v. *Hula's New Haven, LLC,* 157 Conn. App. 489, 115 A.3d 531 (2015).

*Robert T. Harrington*, for the plaintiff.

*Brian P. Kraemer*, for the defendants.

ZEMETIS, J. On January 4, 2010, plaintiff, Ronald LoRicco, Trustee, (LoRicco), sued Hula's New Haven, LLC (Hula), lessee, and Donald Kelly, Albert Silverman and Todd M. Kozakowski, also known as Kazakowski, guarantors of lessee, for payments claimed due under a written commercial lease, Ex. 3, concerning Unit 1A and 2A located at 216 Crown Street, New Haven. The complaint seeks money damages for unpaid monthly rents and other sums claimed due from tenant and guarantors pursuant to the lease. The defendants filed a May 14, 2012 Second Amended Answer and Special Defenses. Plaintiff denied the Special Defenses.

LoRicco was an owner of several commercial condominium units, including first floor units 1A and 2A, within a six-story high-rise commercial building in downtown New Haven known as the LoRicco Tower located at 216 Crown Street, Ex. 1, deed. The LoRicco Tower Condominium Association operated the building, Ex. 2, Declaration of LoRicco Tower Condominium.

LoRicco leased two first floor condominium units, together with a mezzanine, to Hula in 2005 contemporaneously with Hula's purchase of a nightclub business, known as Mystic, which had been operating in the subject premises. Hula paid $375,000 for Mystic's business and property. Hula had, prior to the business purchase, obtained from Mystic a copy of Mystic's lease with LoRicco, then approached and negotiated a ten (10) year lease with LoRicco for much of the same space that Mystic had been using for its nightclub business. LoRicco and Hula used nearly the same lease and guaranty as in the LoRicco-Mystic documents with some modification favoring Hula—including lowering Hula's security deposit and common area maintenance charges (CAM) compared to Mystic's security deposit/

CAM charges, providing refuse collection as part of the rent, and, most importantly for purposes of this case, lowering Hula's percentage participation of any Special Assessment that the condominium association might levy during the first three years of the term of the lease. Correspondence between counsel for LoRicco and Hula during their lease negotiations confirmed the substantial similarity between the LoRicco-Mystic and LoRicco-Hula leases.[1]

Attorneys Ronald LoRicco and Richard LoRicco, Jr., negotiated the lease for the plaintiff. Attorney Michael Noto negotiated the lease for all the defendants. All parties were sophisticated business people voluntarily entering in a negotiated agreement to lease space to operate a nightclub. The lessors were sophisticated real estate managers and lawyers. The guarantors had substantial experience in the operations of nightclubs and bar business. The negotiations proceeded over approximately five sessions during February and March of 2005 with numerous documents being exchanged between counsel, Ex. 31 through 37.

The lease term commenced on May 1, 2005, and had an initial term of ten (10) years with two five (5) year extension options. Importantly, the lease described the monthly rental payments and other obligations of the parties. The lease included a guaranty which was signed by each of the individual defendants.

The lessee did not remain in possession of the premises for the full term of the lease but instead returned the keys to the premises to the landlord on July 10, 2010. The rental arrearage, excluding a claim for Special Assessment "additional rent,"[2] but including monthly base rent, monthly common area charges and municipal

---

[1] Ex. 32, page 2, paragraph 6 entitled "Lease," "[T]he lease shall be substantially the same as the existing lease with the current occupant."

[2] Ex. 3. B.

real estate taxes, and late rent payment charges: $49,803.53 at that time, Ex. 4. Although the lessee returned the keys to the landlord in July, 2010, the lessee left substantial personal property in the demised premises, directing the landlord to sell the same to a prospective new tenant. No such sale occurred, as the landlord/lessor declined to act as a sales agent for the lessee, and no lease agreement was reached with the prospective tenant recommended or referred by Hula for reasons beyond the lessor's control and due to no fault of the lessor.

Hula and the guarantors do not contest that the $49,803.53 claimed due is properly calculated in accordance with the lease and the lessor's records of lessee's payments, but contests the defendants' obligation to pay the same.

LoRicco never instituted a summary process action against Hula. LoRicco testified that he never asked Hula to leave, nor did he want Hula to leave—he simply wanted them to pay the rents due. LoRicco initiated an action to collect past due rent and other charges under the lease in January, 2010. Hula voluntarily tendered the keys to the demised premises to the landlord on July 10, 2010. The parties agreed that the lessor's claims for payments due under the lease cease as of June 30, 2011.

## LESSOR/PLAINTIFF'S CLAIMS

. LoRicco claims various sums due and owing under the lease from the tenant and/or the guarantors in addition to the aforementioned $49,803.53. The $49,803.53 is claimed due from tenant for the period prior to July 10, 2010 (the day lessee tendered the keys to the lessor).

LoRicco also claims that defendants owe a $232,800 "special assessment," pursuant to Lease paragraph 3.B.

Defendants contest this claim. These sums are claimed due from tenant for the period prior to July 10, 2010.

Additionally, LoRicco claims that defendants owe base rent, additional rent and late charges (all defined in the Lease within paragraph 3) for the period from July 1, 2010, to June 30, 2011, totaling $160,204.14.

Defendants do not contest the calculation of the claim but contest the defendants' obligations to pay the same. These sums are claimed due from tenant for the period July 1, 2010, and June 30, 2011.

LoRicco also claims consequential damages, payable pursuant to the lease, for temporary heat, HVAC repair and estimated replacement costs totaling $33,498.99, Ex. 21 through 28. Defendants contest this claim. These claims arise during the period after July 1, 2010.

LoRicco claims attorney's fees totaling $36,125. Guarantors contest their obligation to pay any of this claim and Hula contests a small portion of the claim, $6500, arguing that charges in connection with a motion for summary judgment should be disallowed as the motion was unreasonably filed and unnecessary.

### DEFENDANTS' RESPONSE AND SPECIAL DEFENSES

Hula's admits the signing of the lease, admits failing to pay various rent obligations in a timely fashion, admits the tendering of the keys to the landlord on July 10, 2010 (well before the end of the initial lease term), does not contest the accuracy of the accounting, Ex. 4, of the landlord's rental payment/receipts records and lessor's calculation of the sums due under the lease for base rent, CAM and municipal taxes—though, as noted above, does not concede liability to pay the landlord's calculation of indebtedness.

Guarantors admit signing the Guaranty, admit that lessee failed to timely pay rent to the lessor, and admit lessor's demand upon the guarantors for payment of lessee's obligations under the lease. However, they testified that they had a different understanding of their obligations under the guaranty than landlord claims. Attorneys Ronald and Richard LoRicco, Jr., recalled face-to-face negotiation with Attorney Noto, with one or more of the principals of Hula/guarantors present, wherein the meaning of the Guaranty was discussed. LoRiccos claimed that they explained that the Guaranty limited the guarantors' liability to any and all arrearages at the time of default and not more than twelve months of future rental payments and other lease obligations. The guarantors deny this conversation and assert that the Guaranty requires payment of only twelve months of future rent from default/lease termination/tender of the premises to landlord with no obligation toward tenant's past due sums or any rent arrearage.

The guarantors conclude that the parties currently claim different understandings as to the meaning of the Guaranty and that the Guaranty is unenforceable, as there was no "meeting of the minds" and hence no valid contract.

The defendants dispute the HVAC repair or replacement charges.

Hula's disputes $6500 in plaintiff's attorney's fees connected with research, preparation, filing and arguing a motion for summary judgment because the motion was legally insufficient and should not have been made, Def. Trial Brief, p. 13. Guarantors dispute all attorney's fees, arguing the same are outside the scope of the Guaranty.

The defendants raise three Special Defenses: first, that lessor breached the implied covenant of good faith and fair dealing by seeking to impose an unreasonable assessment upon the lessee/guarantors; second, that

lessor fraudulently induced the lessee/guarantors to sign a lease containing an assessment provision but withheld from the defendants the condition of the building and/or their intention to undergo major renovations for which they would seek substantial financial contribution from the defendants; and, third, that lessor is indebted to the defendant Hula in the amount of $15,000, representing the security deposit given in connection with the lease.

## APPLICABLE LAW AND DISCUSSION
## OF PLAINTIFF'S CLAIMS

"Connecticut law is clear that [i]n an action for rent due, a lessor of commercial property is generally under no obligation to mitigate his damages after the lessee fails to pay rent. . . . Such an obligation arises only if the lessor manifests an intent to terminate the tenancy either by taking an unequivocal act showing this intent or by bringing an action for damages based on the tenant's breach of contract. . . . In other words, [w]hen the lessee breaches a lease for commercial property, the lessor has two options: (1) to terminate the tenancy; or (2) to refuse to accept the surrender. . . . Where the landlord elects to continue the tenancy, he may sue to recover the rent due under the terms of the lease. Under this course of action, the landlord is under no duty to mitigate damages. . . . When the landlord elects to terminate the tenancy, however, the action is one for breach of contract . . . and, when the tenancy is terminated, the landlord is obliged to mitigate his damages." (Citations omitted; internal quotation marks omitted.) *Brennan Associates* v. *OBGYN Specialty Group, P.C.*, 127 Conn. App. 746, 754, 15 A.3d 1094, cert. denied, 301 Conn. 917, 21 A.3d 463 (2011).

The rent calculations for base rent/CAM/taxes and late charges, calculated for the time prior to and subsequent to the tendering of the premises keys, are not in

dispute. The lease describes the rental payments: base rent—monthly payments with an annual escalating clause, Ex. 2, 3.A.

The lessor had no complaints about lessee's rent payments during the first several years of the lease term.

During 2009, the lessee began to make tardy/late/sporadic monthly payments. In April, 2010, lessor received the last payment from the lessee, Ex. 4.

Lessor calculated the arrearage for base rent, CAM/taxes and late rental payment charges, as of June 30, 2010, to be $49,803.53. Lessor established a prima facie case for these sums against Hula. Defendants do not dispute this *calculation, but raise Special Defenses to the claims.* The Special Defenses will be addressed following the discussion of plaintiff's claims.

The lease, Ex. 2, 3.B, provides in part, "[A]dditionally, the Lessee shall pay any and all assessments of the LoRicco Tower Condominium Association, except for in the initial three (3) years of the lease during which period the lessee shall pay 1/2 of any such assessment." Ex. 11, and 14 through 19, established the following: that the LoRicco Tower Condominium Association did meet and adopt a resolution authorizing one or more Special Assessment(s) against all unit owners/occupants for the costs of repairs and/or improvements to make the building water tight and such other facade and exterior or interior work as may be deemed appropriate; that in February, April and August of 2008, Ex. 11, 17 and 18, the Special Assessments were calculated and unit owners/occupants, including Hula, were notified of their respective obligations; that Hula failed to timely pay the assessment, calculated on a proportionate square footage basis of the respective units to the whole building, and hence the plaintiff/lessor paid the assessment attributable to Hula and charged this sum against Hula's rental account, Ex. 4.

The total Special Assessment against Units 1A and 1B was $465,600. Pursuant to Ex. 2, 3.B, because the assessment occurred within the first three years of the term of the lease, LoRicco claims that Hula owed $232,800, Ex. 19, i.e., 50 percent of the Special Assessment. The documentation for the architectural/contractor's bills totaling $2,021,931.80 is found in Ex. 12 and 13. The condominium association board members, Ronald LoRicco and Richard LoRicco, Sr., and Jr., owned 92.13 percent of the LoRicco Tower and therefore paid 92.13 percent of the $2,021,931.80 bill for repairs and renovations necessary to preserve and maintain the building.

The evidence established that the repairs and renovations to the LoRicco Tower did cost $2,021,931.80 and that the repairs were reasonable and necessary to repair and maintain the building.

Attorney Noto, defendants' counsel during the lease negotiations, testified that during negotiations, he was concerned about the condo association's ability to impose an assessment. Attorney Noto recalled he voiced his concern about the possibility that the elevator in the building might need expensive repairs or replacement. His concerns were alleviated when the lessor assured him that the elevator was in good working condition. Attorney Noto did not suggest or request any provision limiting his clients'/guarantors' liability to any maximum sum or excluding certain types of condominium assessments. In short, the defendants were aware of the possibility of a Special Assessment, that the Special Assessment might involve a portion of the six-story building that they did not often or directly use, e.g., the elevator, and that such an assessment might be costly. Yet the defendants did not negotiate any limitation on their contractual responsibilities for such assessments.

Lessor calculated the lessee's proportionate share of the total Special Assessment, reduced in accordance

with the lease, Ex. 3, 3.B, to be $232,800. Lessor established a prima facie case for these sums against Hula. Defendants do not dispute this *calculation, but raise Special Defenses to the claims*. The Special Defenses will be addressed following the discussion of plaintiff's claims.

Next, LoRicco established that the defendants owe base rent, additional rent and late charges (all defined in the Lease, Ex. 3, paragraph 3) for the period from July 1, 2010, to June 30, 2011, totaling $160,204.14. Lessor established a prima facie case for these sums against Hula. Defendants do not dispute this calculation, but raise Special Defenses to the claims. The Special Defenses will be addressed following the discussion of plaintiff's claims.

Next, LoRicco claims consequential damages, payable pursuant to the lease, for temporary heat, HVAC repair and estimated replacement costs totaling $33,498.99, Ex. 21 through 28. Defendants contest this claim. These claims arise during the period *after* July 1, 2010.

The lessee tendered the keys to the demised premises in July, 2010. The premises remained vacant for nearly a year thereafter, but, in December, 2010, the lessor discovered that the HVAC system for the demised premises was not properly functioning. The lessor presented bills for an engineering repair survey, $846, Ex. 27, and the testimony of Benjamin Uscilla. Mr. Uscilla is a licensed contractor with over twenty years of experience in HVAC work. The estimated cost of repairs of the HVAC system was $23,500, Ex. 28. The lessor also presented bills totaling $9152.99, Ex. 21 through 26, inclusive, for "temporary heat," contractor's bills describing delivery, set up, inspection and operation of propane powered heaters in the units and basement of

the units during December, 2010, so as to prevent pipes freezing and rupturing causing damage to the building.

The lease, Ex. 3, paragraph 10, "Maintenance and Repairs," subparagraph H (d), required the lessee "not less than every one hundred-eighty days . . . engage qualified contractors to inspect, *maintain, repair and replace, if required,* the facility's systems and equipment or whatever kind, including but not limited HVAC . . . and provide written certifications . . . to the Lessor attesting to the services provided and the good working order of each such system and/or equipment." (Emphasis added.)

Lessee contested whether the repairs of the HVAC system, discovered and documented five months after the lessee vacated the premises, were existent in July when lessee vacated. However, lessee offered no "written certifications . . . attesting to the . . . good working order" of such HVAC system for any period of the lease.

Uscilla, lessor's witness, testified he saw nothing to indicate that the HVAC system was in any different condition in December than likely existed in July—no obvious evidence of recent damage. He also testified that no work, other than temporary repair work to get the existing HVAC running, was done to replace or upgrade the HVAC system serving the demised premises.

However, the lessor offered no evidence that the HVAC system was ever actually replaced or repaired or at what cost. The court declines to speculate on whether the HVAC was replaced and/or the cost of such based on mere estimate of replacement costs when no evidence was offered to prove that such replacements were made, but rather that new tenants occupy the space and use the HVAC system.

The court does allow the lessor the reasonable costs of determining the condition of the HVAC system, the "survey" costs, and the costs of securing and protecting the demised premises preventing any freezing of pipes or other plumbing damage, the "temporary heat" costs.

These two items total: $9988.99.

LoRicco claims attorney's fees totaling $36,125. Guarantors contest their obligation to pay any of this claim, and Hula contests a small portion of the claim, $6500, arguing that charges in connection with a motion for summary judgment should be disallowed, as the motion was unreasonably filed and unnecessary.

Hula contests the reasonableness of the plaintiff's counsel's attorney's fees only with respect to the $6500 of charges allocable to the research, preparation and arguing of the motion for summary judgment. The court rejects this assertion. The summary judgment motion, though unsuccessful, was not an unreasonable effort to resolve some of the issues before the court, nor was the time expended in this effort unreasonable. The motion for summary judgment is appropriate in civil cases where there exists no genuine issue of material fact and the movant is entitled to judgment as a matter of law as to at least one or more of the claims or defenses in the case, Practice Book § 17-45. Though the court did find that a genuine issue of material fact did exist with respect to some or all of the defendants' liability under the lease and guaranty, neither the prosecution of the motion nor the time and expense related thereto were unreasonable in the context of the instant case. The motion was instrumental in subsequent narrowing of the issues—witness the amended pleadings following the filing of the motion and briefs—and the simplification of the evidence at trial as a consequence of the documentation offered in support of the motion. Though the movant did not prevail on the motion, the

motion and the accompanying brief and supporting documentation assisted both the parties and the court in the subsequent proceedings.

The court finds the $36,125 of attorney's fees to be reasonable and necessary in this matter. The plaintiff's counsel documented, with time sheets detailing date, time, service performed and hourly rate charged for all the time spent on this matter. This court carefully examined the billing and finds the same meets the legal standards described below, including that the hours spent and the hourly rate charged was reasonable and appropriate for the type and complexity, factually and legally, of case involved.

"[T]he initial estimate of a reasonable attorney's fee is properly calculated by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate. . . . The courts may then adjust this lodestar calculation by other factors." (Citation omitted; internal quotation marks omitted.) *Laudano* v. *New Haven*, 58 Conn. App. 819, 822–23, 755 A.2d 907 (2000). For guidance in adjusting attorney's fees, Connecticut courts have adopted the twelve factors set forth in *Johnson* v. *Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974). The *Johnson* factors are (1) the time and labor required, (2) the novelty and difficulty of the questions, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee for similar work in the community, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation and ability of the attorneys, (10) the undesirability of the case, (11) the nature and length of the professional relationship with the client and (12) awards in similar cases. Id.; see also *Krack* v. *Action Motors Corp.*, 87 Conn.

App. 687, 695, 867 A.2d 86, cert. denied, 273 Conn. 926, 871 A.2d 1031 (2005); Rules of Professional Conduct 1.5; *Ernst* v. *Deere & Co.*, 92 Conn. App. 572, 576, 886 A.2d 845 (2005).

## APPLICABLE LAW AND DISCUSSION OF DEFENDANTS' SPECIAL DEFENSES

The defendants raise three Special Defenses:[3] first, that lessor breached the implied covenant of good faith and fair dealing by seeking to impose an unreasonable assessment upon the lessee/guarantors; second, that lessor fraudulently induced the lessee/guarantors to sign a lease containing an assessment provision but withheld from the defendants the condition of the building and/or their intention to undergo major renovations for which they would seek substantial financial contribution from the defendants; and, third, that lessor is indebted to the defendant Hula in the amount of $15,000 representing the security deposit given in connection with the lease.

The First Special Defense alleges: "Plaintiff breached the implied covenant of good faith and fair dealing by seeking to impose an unreasonable assessment upon the Defendant Hula's New Haven, LLC."

"The relevant legal principles are well established. [I]t is axiomatic that the . . . duty of good faith and fair dealing is a covenant implied into a contract or a contractual relationship. . . . To constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a [party] allegedly impedes the [other party's] right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith. . . . Bad faith has been defined

---

[3] See Defendants' May, 2012 Second Amended Answer and Special Defenses.

in our jurisprudence in various ways. Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. . . . Bad faith means more than mere negligence; it involves a dishonest purpose. . . . [B]ad faith may be overt or may consist of inaction, and it may include evasion of the spirit of the bargain . . . ." (Internal quotation marks omitted.) *Brennan Associates* v. *OBGYN Specialty Group*, supra, 127 Conn. App. 759–60; see also *Keller* v. *Beckenstein*, 117 Conn. App. 550, 563–64, 979 A.2d 1055, cert. denied, 294 Conn. 913, 983 A.2d 274 (2009).

First, the parties, sophisticated business people, represented by counsel of their choice, voluntarily negotiating a commercial lease for space for a nightclub business, may contract, within the bounds of the law, as they wish. The evidence is they did just that. This court is bound by "the well settled general principle that [c]ourts of law must allow parties to make their own contracts." *Connecticut Union of Telephone Workers* v. *Southern New England Telephone Co.*, 148 Conn. 192, 201, 169 A.2d 646 (1961). It is established well beyond the need for citation that parties are free to contract for whatever terms on which they may agree. *Holly Hill Holdings* v. *Lowman*, 226 Conn. 748, 755, 628 A.2d 1298 (1993). Whether provident or improvident, an agreement moved on calculated considerations is entitled to the sanction of the law . . . . *Collins* v. *Sears, Roebuck & Co.*, 164 Conn. 369, 375, 321 A.2d 444 (1973)." (Internal quotation marks omitted.) *Crews* v. *Crews*, 295 Conn. 153, 169, 989 A.2d 1060 (2010).

The evidence established that the parties negotiated and agreed to the payment of "additional rent" that

included the possibility of a Special Assessment. Attorney Noto's testimony confirmed that the defendants were aware of the meaning of a Special Assessment and the potential for imposition thereof and expense related thereto.

However, as discussed below, there is an absence of persuasive evidence that the lessor engaged in any bad faith conduct or action. There was no persuasive evidence of dishonest purpose or design to mislead with respect to the possibility of the imposition of an unreasonable Special Assessment. As discussed below, there was no persuasive evidence of actual or constructive fraud by the lessor in connection therewith.

The defendants have failed to sustain their burden of proof with respect to their First Special Defense, as the court does not find that the lessor breached the covenant of good faith and fair dealing implied in the lease agreement by the imposition of the assessment for necessary repairs and renovations of the building.

In the "Second Special Defense as to All Counts," all defendants claim that LoRicco fraudulently induced them to sign the lease/guaranty by withholding "from the defendants the condition of the building and/or [the] intention to undergo major renovations for which [it] would seek substantial financial contribution from the defendants." Second Special Defense.

This defense requires an explanation of the history of the building and repairs made prior to and contemporaneously with the lease negotiations between the captioned parties. Evidence, Ex. 29 and Ex. C, proves that between 2000 and 2005 the LoRicco Towers building had roof repairs, facade repairs, and chimney cap repairs to address water infiltration in the upper floors of the building. Attorneys LoRicco described plaster on the ceiling/walls/trim as disfigured/discolored, indicating water leakage, and the condo association retained

contractors to analyze the problem and then to repair and replace roofs, seal windows and repair/re-point a portion of the building's brick and mortar facade.

Prior to the execution of Hula-LoRicco lease, the LoRicco Tower building had extensive repair and maintenance work done, between the summer of 2004 and the spring of 2005, and testimony of both Attorneys LoRicco and Ex. 29 document new roof decking, insulation, roofing membrane and the sealing/pointing/waterproofing the facade of the building's northern face, see ninety-six color photographs documenting the scope of the work in Ex. 38. This work was done in response to water infiltration noted on the interior of the upper floors of the building. The cost of this work exceeded $90,690, Ex. 29, 39 and 40 and C. The need for this work and the costs associated all predate the relationship between LoRicco-Hula/Guarantors. No part of the $90,690 cost was sought from or paid by the defendants.

Attorneys LoRicco testified, and the court finds their testimony persuasive and credible, that they believed that the extensive roof/facade repairs, completed in 2005, solved the water infiltration problem. They might have been wrong as further water infiltration was discovered in late 2006, but they would not discover their possible error until many months after the negotiation and execution of the subject lease. They might have been right that the 2005 facade/roof repair/refurbishing work was successful in sealing those areas, but that other breaches in the buildings' envelope allowed water to infiltrate the building. There was no compelling evidence to persuade the court whether the infiltration problem described in the LoRicco Tower Condominium Association board of director meeting minutes from December, 2006, was part of a problem that predated the lease or was an additional infiltration or a combination thereof.

By December, 2006, Ex. B, the condo association minutes reflect "continuing water infiltration/deterioration, which continues even after the completion of the roof replacement." The minutes' author, with the benefit of hindsight, may have assumed that the infiltration was "continuing . . . even after the completion of the roof replacement," but the author's knowledge or supposition contained in that statement made in December, 2006, cannot be imputed retroactively to the lease negotiations between these parties in February and March of 2005.

After the December, 2006 condominium association board meeting, the association hired Hoffman Architects, architects specializing in water related problems and restoration, to further analyze the water infiltration problem.

LoRicco Towers retained Hoffman Architects, Ex. 9, to survey the building, recommend necessary repairs and renovations and supervise the contractors, and certify the work of the contractors who would repair and renovate the building in accordance with the architects' recommendations. The architectural services cost $82,018.01. Substantial repairs/renovations/improvements were recommended. Over the next three years the condominium association spent approximately $2,000,000, Ex. 12 for compilation and Ex. 9 through 12, to renovate, repair and improve the building. On June 1, 2007, the condo association voted a Special Assessment against the unit owners/occupants to pay these repairs, Ex. 14. The unit owners paid that Special Assessment, Ex. 15. Work began in February, 2008, and ended October, 2009.

The defendants assert that the plaintiff fraudulently induced Hula to sign the lease in the spring of 2005 when the lessor (Ronald LoRicco, Trustee) "withheld from the defendants the condition of the building and/or

their intention to undergo major renovations for which they would seek substantial financial contribution from the defendants."

The defense asserts that Ronald LoRicco, Trustee, fraudulently induced Hula's execution of the lease by withholding information about the condition of the building. Additionally or alternatively, the defense asserts fraudulent inducement by withholding "[the] intention to undergo major renovations" for which "[it]" would seek substantial financial contribution.

"Fraud in the inducement to enter a contract is a well established equitable defense. . . . Fraud and misrepresentation cannot be easily defined because they can be accomplished in so many different ways. They present, however, issues of fact." (Citation omitted; internal quotation marks omitted.) *Barasso* v. *Rear Still Hill Road, LLC*, 81 Conn. App. 798, 806, 842 A.2d 1134 (2004).

The party claiming fraud has the burden of proof and must prove each element by clear and convincing evidence. *Black* v. *Goodwin, Loomis & Britton, Inc.*, 239 Conn. 144, 163, 681 A.2d 293 (1996). Clear and convincing evidence is evidence that is substantial and that unequivocally establishes the elements of fraud in the inducement. Clear and convincing evidence is evidence that establishes that the "facts asserted are highly probably true, that the probability that they are true or exist is substantially greater than the probability that they are false or do not exist." (Internal quotation marks omitted.) *Correia* v. *Rowland*, 263 Conn. 453, 475 n.22, 820 A.2d 1009 (2003).

"Fraud consists in deception practiced in order to induce another to part with property or surrender some legal right, and which accomplishes the end designed. . . . The elements of a fraud action are: (1) a false representation was made as a statement of fact; (2) the

statement was untrue and known to be so by its maker; (3) the statement was made with the intent of inducing reliance thereon; and (4) the other party relied on the statement to his detriment." (Internal quotation marks omitted.) *Terry* v. *Terry*, 102 Conn. App. 215, 223, 925 A.2d 375, cert. denied, 284 Conn. 911, 931 A.2d 934 (2007).

First, there is a grammatical problem with the defense: the lessor is a single trustee: Ronald LoRicco, not "they." There was insufficient evidence that Ronald LoRicco was authorized to speak as an agent of the LoRicco Tower Condominium Association or its Board of Directors during the subject lease negotiations. Nor is the LoRicco Tower Condominium Association or its Board of Directors parties in this case. Any action or inaction by those actors is not considered by this court in this matter. However, defendants assert that the lessor fraudulently misrepresented the condition of the LoRicco Tower building by stating that the building was in good condition with no known problem that might impact the lessee. Defendants argue this statement was false, lessor knew it was false, that the statement was made to induce the lessee and guarantors to sign the lease and the lessee/guarantors reasonably relied upon this statement to their detriment. The lessee/guarantors insist that had they known of the water infiltration problem in the building, they would not have signed the lease.

The court rejects this defense. The defendants have failed to establish by clear and convincing evidence the elements of the action for fraud in the inducement.

The claim that the lessors were asked about and responded to the inquiry concerning the state of the building is not documented in any of the correspondence or in the lease. In fact, the lease specifically states that the tenant/lessee inspected the building and

accepted it in "as is" condition. Ex. 2, 2C. Attorney LoRicco's testimony was that defendants had the right to inspect the premises but that he recalled no tradesmen, engineers or other experts performing inspections.

Further, the lease, Ex. 3 P.30.B, "Entire Agreement," provides that "This lease contains the entire agreement between the parties and all prior agreements, [lease], discussions, and undertakings between the parties are merged herein and superseded hereby."

Further, the credible evidence from Attorneys LoRicco is that they believed the water infiltration problem, discovered in the period between 2000–2003 involving the upper floors of the building where plaster ceiling/wall/trim was deformed, was resolved by the work contracted for in 2003 and completed in 2005. In short, the court entirely rejects the second element of the fraud action that the lessor made a statement known to be untrue *if* there was any representation, other than in the lease, concerning the condition of the building. If there was any statement of the condition of the building, other than the "as is" condition stated in the lease, as the same may pertain to the water infiltration issue, the defendant did not prove by clear and convincing evidence that Ronald LoRicco knew that the statement was untrue during the negotiations of the subject lease.

Finally, lessor had economic incentives during lease negotiations directly contrary to lessee's current claims. Recall that lessee bought Mystic Nightclub's business, examined Mystic's lease and negotiated a new lease with LoRicco during the spring of 2005. LoRicco's lease with Mystic required the tenant to pay 100 percent of any Condominium Association Special Assessments as "additional rent"—similar to the LoRicco-Hula lease—*except* that the lessor gave Hula a 50 percent reduction

on any Special Assessment imposed during the first three years of the Hula lease term.

Had LoRicco known that the water infiltration issue was not resolved and that the same would require repairs, perhaps expensive repairs, LoRicco had economic incentives to keep Mystic as a tenant, to allow Mystic to assign its lease to Hula, thereby retaining the lease requirement of occupant responsibility for 100 percent of Special Assessments or to insist on the continuation of the 100 percent share of Special Assessments on Hula during the term of the lease. Instead, as noted above, LoRicco, confident that the water infiltration problem was solved and that the building would need no Special Assessments, voluntarily reduced lessees/occupants' responsibility for Special Assessments during the first three (3) years of the ten (10) year term from the existing 100 percent proportionate responsibility to 50 percent responsibility.

In fact, the lease concession negotiated by Hula, for 50 percent reduction of any Special Assessment during the first three years of the lease term, cost Ronald LoRicco, Trustee, the same amount, $232,800, as Hula was charged.

The court finds that the defendants have failed to prove by clear and convincing evidence the elements of fraudulent inducement.

However, the court agrees that the defendants, and the plaintiff concedes this as well, have proved their Third Special Defense, partial payment. The lease acknowledges the $15,000 security deposit and the lessor's accounting, Ex. 4, fails to account for the use of those funds to reduce tenant's liability as permitted by the lease, Ex. 3, para. 25.[4]

---

[4] "All sums held as security deposit shall not bear interest and may be co-mingled by Lessor with other funds of Lessor. . . . It is agreed that in the event Lessee defaults in respect of any of the terms, provisions, and conditions of this lease, including, but not limited to, the payment of rent and/or additional rent, Lessor may use, apply or retain in whole or any part

Therefore, the court finds that the lessee, Hula's New Haven, LLC, is liable to the plaintiff for rent, basic and additional, for the period from the start of the lease term, May 1, 2005, until July 1, 2010, in the amount of $49,803.53 (basic rent, CAM, taxes & late fees prior to July 1, 2010), plus $232,800 for the Special Assessment, plus $160,204.14 for rent and late charges from July 1, 2010 through June 30, 2011, plus $36,125 attorney's fees, plus $9988.99 for HVAC survey and temporary heat, for a gross total of: $488,921.66. This sum is reduced by the $15,000 security deposit (Third Special Defense) leaving a net total: $473,921.66.

The Guarantors contest their liability under the Guaranty.

The Guaranty provides: "For a rolling twelve (12) month period into the future, throughout the term of the lease and including any extension thereof, in consideration of the execution of the within lease by the Lessor, at the request of the undersigned and in reliance of this guaranty, the undersigned hereby jointly and severally guarantee unto the Lessor, its successors and assigns, the prompt payment of all rent, and the performance of all of the terms, covenants and conditions provided in said lease, whether oral or in writing, hereby waiving all notice of the default, and consenting to any extensions of time or changes in the manner of payment or performance of any of the terms and conditions of the said lease the Lessor may grant the Lessee, and further consenting to the assignment and the successive assignments of the said lease, and any modifications thereof, including the sub-letting and changing of the use of the demised premises, all without notice to the undersigned. The undersigned agree to pay the Lessor all expenses incurred in enforcing the obligations of

---

of the security so deposited to the extent required for the payment of any rent and/or additional rent . . . ." Lease, Ex. 3, para. 25.

the Lessee under the within lease, whether oral or in writing, and in enforcing this guaranty." Ex. 3, last page *"Guaranty."* (Emphasis added.) This document was signed by all three of the individual defendants after consultation with their legal counsel.

LoRicco claims the guaranty requires the guarantors to pay all arrearages due from tenant prior to vacating the premises AND any amounts due under the lease for a twelve (12) month period thereafter. LoRicco claims the guarantors owe $512,431.66, representing the basic rent and additional rents (CAM, taxes, late fees AND special assessment) accrued *prior to* Hula's tendering of the keys to the demised premises to LoRicco on July 10, 2010, TOGETHER WITH all sums due under the lease from July 10, 2010, to June 30, 2011, see LoRicco's Trial Memorandum, page 13.

Guarantors argue that there was obviously no meeting of the minds concerning the terms of the Guaranty, that the guaranty is ambiguous and unenforceable, and/ or that the guarantors' liability is limited to a twelve (12) month period while excluding both the Special Assessment obligation and payment of LoRicco's attorney's fees in connection with this action, but that the particular twelve (12) month period is not defined by the guaranty, see Defendants' July 16, 2013 Trial Brief, page 5 et seq.

Both parties argue that the underlying guaranty clearly and unambiguously support their position and require that judgment enter in their favor. Consequently, the court begins with the principles of contract interpretation that it must apply.

"A guarantee is a contract. *Garofalo* v. *Squillante,* 60 Conn. App. 687, 694, 760 A.2d 1271 (2000), cert. denied, 255 Conn. 929, 767 A.2d 101 (2001). The plaintiff's claim requires us to examine the terms of the guarantee. The question of the parties' intent is [o]rdinarily . . . a

question of fact [subject to appellate review under the clearly erroneous standard]. . . . If, however, the language of the contract is clear and unambiguous, the court's determination of what the parties intended in using such language is a conclusion of law. . . . Thus, in the absence of a claim of ambiguity, the interpretation of [a] contract presents a question of law. . . . Well established principles guide our analysis in determining whether the language of a contract is ambiguous. [A] contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself. [A]ny ambiguity in a contract must emanate from the language used by the parties. . . . In contrast, [a] contract is unambiguous when its language is clear and conveys a definite and precise intent. . . . The court will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity. . . . Moreover, the mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous. . . . *Smithfield Associates, LLC* v. *Tolland Bank*, 86 Conn. App. 14, 18–19, 860 A.2d 738 (2004), cert. denied, 273 Conn. 901, 867 A.2d 839 (2005)." (Internal quotation marks omitted.) *D'Amato Investments, LLC* v. *Sutton*, 117 Conn. App. 418, 423–24, 978 A.2d 1135 (2009). "A court should construe the language of a contract so as not to render any words, phrases, or terms ineffective or meaningless." (Internal quotation marks omitted.) *Sunburst Chemical, LLC* v. *Acorn Distributors, Inc.*, 922 N.E.2d 652, 654 (Ind. App. 2010). "Also, the contract should be read as a whole, and its terms should be interpreted to the extent that the provisions can be harmonized." *Indianapolis-Marion County Public Library* v. *Shook, LLC*, 835 N.E.2d 533, 542 (Ind. App. 2005). "Generally, the courts should presume that all provisions included in a contract are there for a purpose and, if possible, reconcile seemingly conflicting

provisions to give effect to all provisions." (Citations omitted; internal quotation marks omitted.) Id., 541–42.

The parties agree that the purposes of the guaranty were to protect LoRicco's ability to collect sums due under the lease in the event of default or failure to make payments by Hula, a limited liability company with potentially little or no assets, *and*, to limit the guarantors' liability to twelve months of Hula's liability under the lease.

The parties agree that Hula failed to make timely payments to LoRicco for sums due under the lease.[5] The lease, Ex. 3, paragraph 19, provides that LoRicco, "Lessor," *may* give notice of intent to terminate the lease, and tenant an opportunity to cure the some alleged default (not including a default based on failure to timely pay rents due[6]), but that LoRicco never gave such a notice nor instituted any proceedings to terminate the lease.

The Guaranty increases LoRicco's sources, opportunity or likelihood of collecting sums due from, but not timely paid by or collectible from, Hula. The Guaranty also limits the guarantors' liability to twelve months of Hula's liability to LoRicco. Specifically, the guarantors' liability is limited to obligations that arise under the lease during a twelve (12) month period. "For a . . . twelve (12) month period . . . the undersigned hereby jointly and severally guarantee unto the Lessor . . . the prompt payment of all rent, and the performance

---

[5] "Therefore, as the defendant Hula's New Haven, LLC, was always in default under the terms of the lease from March 1, 2009, for either property tax reimbursement under paragraph 3 (b), base rent under paragraph 3 (A) and late fees under paragraph 3 (C), the rolling twelve months would have ended March 1, 2010." Defendants' July 16, 2013 Trial Brief, page 6.

[6] "Notwithstanding any provision herein to the contrary, it is expressly understood and agreed that rentals shall be due and payable as agreed, on the 1st day of each month and the Lessor shall not be required to give Lessee any notice with opportunity to cure such a default." Ex. 3, P 19.A.

of all of the terms, covenants and conditions provided in said lease . . . ."

The question for the court is: which twelve (12) month period? The language of the guaranty makes clear that the period will "roll" throughout the term of the lease rather than beginning on a preselected calendar date. The guaranty does not expressly state what action will trigger, initiate, or start the running of the twelve month period (or put another way: when does the "rolling" guaranty stop "rolling" and start imposing obligations?), whether once started, the clock or running of the twelve month period can be stopped or suspended, or whether the tenant's "cure" of the default might "reset" the clock or twelve month period. These last two concerns are not at issue in this case because once the lessee defaulted on rental payments, there was never a time when the payments were brought up to date or the "default cured."

However, harmonizing the various lease provisions and the expressed intent of the parties in the Guaranty, the court concludes that the twelve month period begins, in this case, with Hula's first failure to make payments due under the lease to the Lessor. The point of the guaranty, from lessor's viewpoint, was to broaden/increase LoRicco's ability to collect payments due under the lease. Hula's failure to make the payments due under the lease started, initiated or began the running of the twelve month period of the guarantors' liability because that was the date when lessor became aware that he may need to impose responsibility on the guarantors. The moment that the lessee failed to timely make payments due under the lease, the lessor knew that he had just twelve months of protection from the guarantors.

The guarantee broadened the lessor's opportunity to collect payments due under the lease while simultaneously limiting the guarantors' liability to a twelve month

period. Lessor's position that guarantors are liable for all arrearages under the lease up until the date when the lessee tendered the keys to the demised premises AND an additional twelve months thereafter would clearly expand the guarantors' liability beyond twelve months limitation expressed in the Guaranty in this instance. This construction would contradict the language of the guaranty and the testimony of the parties. For instance, though the lessee may have defaulted just a few months into the ten (10) year term of the lease, the Lessor might simply wait until twelve months immediately prior to the end of the initial term of the lease and then demand all arrearages AND payment for the twelve successive or remaining months of the lease term, thereby defeating the second acknowledged goal expressed in the Guaranty: limiting the guarantors' liability to a twelve month period. The law of contract construction discourages a construction that renders a contract provision superfluous, *Ramirez* v. *Health Net of the Northeast, Inc.*, 285 Conn. 1, 14, 938 A.2d 576 (2008), and the twelve month limitation period recited in the Guaranty would become superfluous under the lessor's present interpretation.

The guarantors' construction that the twelve month period should start when the lessee tendered the keys to the demised premises to the landlord is also faulty. The lessee might never tender the keys or might wait until less than twelve months before the end of the lease term to tender the keys, thereby depriving the lessor of the twelve month agreed upon period of guaranty. This construction, like the lessor's construction, contradicts the plain meaning of the Guaranty.

The court notes, as did the defendants, the lessee failed to timely pay the revised Additional Rent, Ex. 3, paragraph 3.B, when lessee failed to pay the Special Assessment by August 29, 2008, Ex. 18, and was continuously behind in payments thereafter. Therefore, the

court finds that the twelve month period of guarantors' liability began in August, 2008, and ended July, 2009.

Examining the lessor's rent statement, Ex. 4, the court finds that beginning in April, 2009, through the end of July, 2009, the lessee failed to pay $35,133.91[7] of rent and additional rent for CAM charges, taxes, increased rent, and late fees *as well as* the $232,800 Special Assessment. The total owed by lessee to lessor for the twelve month period between August 1, 2008, and July 31, 2009, the guaranty period, is $267,933.91.

However, after July 31, 2009, the lessee *did make further payments to lessor*. Lessor properly credited those payments to past due rent—whether that rent was the "base rent" or the "additional" rent, Ex. 4. Following the familiar accounting principle that payments by lessee to lessor are first applied to lessee's oldest obligations to lessor, all the payments following July 31, 2009, must be credited against the lessee's indebtedness to the lessor. The lessee's indebtedness began with the first rent default: the August, 2008 failure to pay the Special Assessment. The indebtedness increased during the succeeding twelve month period. As noted above, the total indebtedness for that period, "the guaranty period" of August 1, 2008, to July 31, 2009, was $267,933.91.

An examination of Ex. 4 shows that lessee made nine (9) further payments to lessor after July 31, 2009:

---

[7] The court examined Ex. 4, added the monthly debits or charges by lessor beginning in April, 2009, when tenant first began to fall behind in monthly rental payments, subtracting the credits/payments by lessee for the months through July 31, 2009. This figure, exclusive of the Special Assessment, gave the court the amount of the lessee's "arrearage" for basic rent, CAM, taxes, late fees and annual rent increase for the twelve month period, August 1, 2008, to July 31, 2009, that the court determined was the operative twelve month period of guarantors' liability to lessor.

8/5/09—$10,659.51

9/21/09—$31,978.53

10/23/09—$11,405.37

11/16/09—$11,405.37

12/10/09—$11,405.37

1/25/10—$11,405.37

2/9/10—$11,405.37

3/9/10—$11,405.37

4/12/10—$11,405.37

The rent payments made by lessee to lessor after July 31, 2009, total $122,475.63. Crediting the lessee for the $122,475.63 of rental payments made after July 31, 2009, against the total rental payments, basic and additional rent as defined in the lease, incurred during the twelve month period from August 1, 2008, to July 31, 2009, "guaranty period," i.e., $267,933.91 less $122,475.63, leaves a balance due of $145,458.28.

Additionally, the court finds that pursuant to the Guaranty, guarantors did agree to pay the Lessor "all expenses incurred in enforcing the obligations of the Lessee under the within lease, whether oral or in writing, and in enforcing this guaranty." All expenses include the court costs and fees and lessor's expenses for counsel. The same guaranty required the guarantors to "guarantee unto the Lessor . . . the prompt payment of all rent, and the performance of all of the terms, covenants and conditions provided in said lease . . . ." Paragraph 19.D provided for the defaulting party paying all the expenses, including attorney's fee, incurred in connection with any enforcement action. Guarantors are liable for lessor's attorney's fees under either or both the terms of the Guaranty and/or the lease. As

noted above, the court has found that the $36,125 documented by plaintiff's counsel represent reasonable attorney's fees in this matter.

The court does not find that the Guarantors are liable for the HVAC repairs/survey/temporary heat, as those expenses rose outside the twelve month period of guarantors' liability.

Therefore, the court finds the Guarantors jointly and severally liable with Hula to the extent of their twelve months of lessee' obligations under the lease, $145,458.28, together with reasonable attorney's fees of $36,125 for a gross total of $181,583.28. However, the same security deposit as reduced the lessee's liability for unpaid rent reduces the Guarantors' liability; see footnote 4 of this opinion; wherein the lease authorized the lessor to apply the security deposit to lessee's indebtedness, hence the gross total of $181,583.28 is reduced by the $15,000 security deposit to $166,583.28.

Judgment enters for the plaintiff against Hula New Haven, LLC, in the amount of $473,921.66 together with taxable costs.

Judgment enters for the plaintiff against the Guarantors, Kazakowski/Kosakowski, Silverman and Kelly, in the amount of $166,583.28 together with taxable costs.